CASE 40—MOTION—SEPTEMBER 28, 1865.

# Ex parte O. S. Tenney.

Service in the Confederate army does not legally operate as a disqualification to practice as an attorney and counsellor in the courts of Kentucky.

Ex parte O. S. Tenney.

JUDGE ROBERTSON DELIVERED THE OPINION OF THE COURT:

On the 21st instant, O. S. Tenney, of Mt. Sterling, Ky., filed in this court his affidavit averring that, as a citizen of this State, he had, for ten consecutive years, immediately preceding the year 1862, practiced law in the courts of this Commonwealth, and had been admitted, in the meantime, as attorney in this court; and that, having joined the Confederate army in the fall of that year, he continued to serve in it until the spring of the year 1865, when he returned home, abandoning that service, and, on 14th April, 1865, took the amnesty oath prescribed by President Lincoln's proclamation of pardon, issued on 8th December, 1863, an official certificate of which accompanies the affidavit. And, thereupon, suggesting a desire to remain in Kentucky, and again practice law here, he submitted a motion to be permitted to resume his suspended privilege in this court. On full consideration, we do not feel authorized to withhold this privilege.

A conviction of treason would have subjected the applicant to the statutory denunciation of forensic disfranchisement; but a confession of treason, without conviction, would not have that penal effect, and the amnesty oath, and the consequent executive pardon, relieved the applicant from all liability to conviction of treason, and, *so far*, reinstated him in the *legal status* he previously occupied.

Nevertheless, the expatriation statute of Kentucky might denationalize the applicant as a citizen of Kentucky, and divest him of all the rights and privileges necessarily incident to his forfeited citizenship. And these local penalties could not be averted or remitted by the President's pardon. But neither any law nor usage of Kentucky requires a lawyer to be a citizen as an indispensable prerequisite to the privilege of practicing in any of her courts. And what the law dispenses with, this court will not presume to enact. So far, therefore as the expatriation act denounces a forfeiture of the civil rights of a citizen, *merely as a citizen*, it is not applicable to forensic privileges which are not peculiarly or exclusively incident to citizenship; and, consequently, the constitutional validity of that enactment is not involved in a

judicial decision of the question now presented for our consideration. That question depends upon the law of Kentucky, and the expatriation act presents no legal impediment to the privilege sought in this case. Nor can we decide that the imputed incivism or even immorality of rebellion against the national government legally operates as a disqualification to practice law. Insurrection does not, *per se*, deprive the offender of any civil right, nor authorize his disfranchisement, further than necessary for suppressing his parricidal acts and the positive law prescribes. The insurgent may be as capable, faithful, and trustworthy, in his professional sphere, as if he had never raised an arm against his country. And we will not go beyond that circle to inquire into his personal merits or fitness for admittance to our bar. Beyond this, censorship belongs not to this court. Nor can we decide that his admitted conduct, foreign from the legal profession, will affect his competency or fidelity in the continued practice of its duties.

Wherefore, as the applicant appears to be free from any disqualification, legal or moral, we adjudge that he shall be permitted to practice as an attorney and counsellor in this court.

---

JUDGE WILLIAMS DELIVERED THE FOLLOWING SEPARATE OPINION:

O. S. Tenny, Esq., a practicing attorney of this court, previous to the breaking out of the late rebellion, presented his affidavit and an amnesty oath, dated April 14, 1865, which he claims to be authorized by President Lincoln's proclamation of December 8, 1863, and asked to be permitted to continue to practice as one of its attorneys.

His affidavit discloses the fact that, in the autumn of 1862, he went into the military service of the rebellion, and continued therein until April 14, 1865.

Whatever may be the legal rights or disabilities of affiant, it is apprehended, must depend on the laws of this State.

Whether said amnesty oath, taken at the time and under the circumstances, comes within the objects and reasons of the President's proclamation of December 8, 1863, or whether the subsequent proclamation of President Johnson, and the modification and revocation of certain amnesty oaths previously taken, has the effect to render this oath a nullity, are grave questions, which should only be judicially decided when presented in such manner as to require a judicial determination, when full investigation can be had upon the hearing of adverse parties, and not on a mere *ex parte* proceeding.

Concurring entirely with the Attorney General of the United States in his opinion of August 12, 1865, that citizens of the United States, by engaging in the rebellion, become liable to the pains and penalties which the law inflicts upon *convicted* traitors, but did not lose their citizenship, and that unpardoned rebels could become officers of vessels of the United States, I seek to find whether our laws have attached disabilities to attorneys at law previous to conviction for treason.

It may be remarked, that, whilst this affidavit discloses treasonable acts against the national government, it does not as to the State.

By an act approved August 22, 1862 (*Session Acts*, 245), our Legislature prescribed certain oaths for jury commissioners, grand and petit jurors, which attach disqualifications as to these duties to all persons who cannot take the oath, but does not apply this oath to attorneys at law.

By an act of March 11, 1862 (*Session Acts*, 70–1), commonly known as the expatriation law, citizens who engaged in the rebellion after April 11, 1862, are declared expatriated, and not again to be citizens of this State, without general or special legislation; and an oath is prescribed whereby any one called on may negative his expatriation; but should he fail to do so, he is not to exercise any of the constitutional or legal rights and privileges belonging *only to citizens of Kentucky*.

By section 1, chapter 4, 1 Stanton's Revised Statutes, 185, it is enacted, " that no person shall be licensed to practice as

an attorney at law who shall not be at the time *twenty-one years old.*"

By the second section it is provided, that "before a license shall be granted to any person to practice as an attorney at law, he shall obtain from the county court in which he resides a certificate that he is a person of honesty, *probity,* and *good. demeanor.*"

By section 1, article 2, chapter 4, "attorneys at law of any of the United States, who have been regularly admitted to practice in the superior courts of such States, may be admitted to practice law in any of the courts of this State."

It will be perceived from these various provisions that the right to obtain a license to practice law from our authorities depends on *residence, full age, honesty, probity,* and *good demeanor,* and not on *citizenship;* and the right by non-resident lawyers depends on having a license to practice, and having been admitted to do so in the superior courts of their State; therefore, the right to practice law does not belong to that peculiar class of rights and privileges which can be exercised *only by citizens.*

By section 1, article 1, chapter 4, it is also provided, that "no person *convicted of treason* or felony shall be permitted to practice in any court *as counsel or attorney at law.*" The legal disability attaches on *conviction,* and not before, and this conviction must be by legal proceedings before a competent judicial tribunal.

As there is no disability provided by law, the only remaining question is as to the duty of the court under the power to disbar for such conduct as renders them unworthy as ministers of the law, officers of, and associates of the court. But before this court would attempt to disbar an attorney, it would direct a rule and hear his defense. This is a power the court can exercise at any time; but until such rule shall be directed and heard and determined, he has the right to appear and act as counsel.

But should the court, on its own mere motion, direct such rule in this case? This leads into considerations of another character. The rebellion is now at an end. There is not an

organized armed enemy against either the National or State government. The national government is pursuing a policy of enlightened liberality towards those lately in rebellion.

By the terms of the surrender of the rebel army, under General Lee, to General Grant, the rebel army was to disperse, the rebel soldiers to return to their homes, to pursue their usual avocations. These terms have been approved and acted on, in various ways, by the national authorities; President Johnson has issued a proclamation of amnesty; by which this applicant can obtain a pardon for offenses against the national government, so far as appears herein, even if the oath alluded to should be insufficient. These men must now be permitted to provide for themselves and families by their own labors, else become objects of public charity and paupers. To what good will this tend? The farmers, merchants, mechanics, teachers, and physicians are allowed to return and resume their usual vocations, why not allow the lawyers to do likewise? If he should now demean himself as a peaceable, law-abiding practitioner, neither a regard for the safety of the government, nor of the public peace, nor the public interest, requires that he alone should be treated as an outcast and an outlaw, and private justice forbids he should be.

The Legislature has prescribed no new oaths for attorneys at law. This court has not felt bound, of its own mere will, to prescribe such. The oath filed shows he has sworn anew his allegiance to the national government, and for this purpose it must be regarded as efficacious. As, by the provisions of the expatriation act, he is not a citizen, but a resident, there is no additional oath necessary for him to take.

The right of revolution is natural, God-given, impressed upon our nature, written upon hearts by the finger of Omnipotence, therefore inalienable; and this is the fundamental, controlling idea of our own immortal "Declaration of Independence."

An attempted but unsuccessful revolution is but a rebellion; a political offense *malum prohibitum*, but not *malum in se*. A successful revolution results in the organization of a new government, often adds a new member to the family of

nations, received on terms of equality, and given an honorable position; its founders regarded as good and great men, and crowned as patriots; unsuccessful, they are rebels, subject to condign punishment: still, every other nation affords them asylum and protection. Ours have often given asylum and protection to the rebels against European governments; they, in turn, afford these to our rebels.

This being simply a political offense, no treaty has heretofore been made by nations to surrender this class of fugitives.

Rebellion is terrible in its consequences—leads to great enormities, and, when unjustifiable, as in the present case, a monstrous political offense; but still, is only *mallum prohibitum*, and not *mallum in se*. For these reasons, I believe Mr. Tenney should be permitted to pursue his usual avocation as an attorney of this court without hindrance, unless objections other than his merely engaging in the rebellion should hereafter appear; and therefore I concur with the majority of the court in their determination to permit him to resume his usual avocation.